## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MICHAEL NEWDOW,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No.  04-2208 (JDB)** |
| **GEORGE W. BUSH, PRESIDENT OF THE UNITED STATES, et al.,** | |
| **Defendants.** | |

## <u>MEMORANDUM OPINION</u>

This case draws this Court into the murky waters of the law relating to the Establishment Clause of the First Amendment.  Plaintiff Michael Newdow, a well-known atheist litigant, challenges the inclusion of prayers by invited clergy -- in the form of an invocation and benediction -- at the upcoming Presidential Inauguration scheduled to occur on January 20, 2005. He seeks a declaratory judgment and preliminary injunction to prohibit a practice that has existed for almost seventy years through invited clergy, and that arguably can be traced back to the Inauguration of President George Washington in 1789.[1]

Newdow's present challenge poses complex First Amendment questions relating to one of this nation's most significant public events.  But in addition to such weighty Establishment Clause questions, the case raises substantial issue preclusion and standing questions that require this

---

[1]  This Memorandum Opinion will address only Newdow's motion for a preliminary injunction.  The Court has considered, but will not rule on at this time, defendants' motions to dismiss.

Court to proceed cautiously, particularly given Newdow's prior litigation involving the very same subject matter and the present context of a request for expedited consideration of a motion seeking the extraordinary relief of enjoining the President.[2]  The Court is therefore mindful of the guidance expressed by the Supreme Court just last year in another case brought by Newdow challenging the inclusion of the words "under God" in the Pledge of Allegiance:

> The command to guard jealously and exercise rarely our power to make constitutional pronouncements requires strictest adherence when matters of great national significance are at stake.  Even in cases concededly within our jurisdiction under Article III, we abide by "a series of rules under which [we have] avoided passing upon a large part of all the constitutional questions pressed upon [us] for decision."

Elk Grove Unified School District v. Newdow, 124 S. Ct. 2301, 2308 (2004) (modifications in original) (quoting Ashwander v. TVA, 297 U.S. 288, 346 (1936) (Brandeis, J., concurring)).

Taking careful account of two such rules -- issue preclusion and standing -- as well as Newdow's First Amendment claims, the Court concludes that the extraordinary preliminary injunctive relief Newdow seeks must be denied.[3]

---

[2]  Newdow seeks preliminary injunctive relief at this time although the actual content of any prayer to be given at the 2005 Inauguration is not known to him or to this Court.  On the other hand, there is no question that prayers by invited clergy in the form of an invocation and a benediction will be part of the 2005 Inauguration.

[3]  In his Reply filed on January 12, 2005, Newdow contends that an injunction against the President is not necessary, as a declaratory judgment that clergy prayer at a Presidential inauguration violates the Establishment Clause will redress his claim.  Whatever validity that position may otherwise have, surely it makes no sense in the present context, where a preliminary injunction, not a "preliminary declaration," is actually and necessarily the relief sought.

**BACKGROUND**

I.    **Newdow's Prior Challenge to Inaugural Prayer**

A few days after the 2001 Inauguration, Newdow challenged the use of inaugural prayers.

See Newdow v. Bush, No. CIV S-01-218 (E.D. Cal.).[4]  Having watched the Inauguration on

television, he contended that the prayer delivered was "a religious act per se" and "was clearly

sectarian as well."  2001 Compl. ¶¶ 12-13.  Newdow asserted that

> [t]he effect of the [clergy's] purely religious words was for Christian Americans to
> perceive them as an endorsement of their Christianity, and for non-Christian
> Americans including plaintiff to perceive the Pledge [sic] as a disapproval of their
> non-Christianity.

Id. ¶ 29.  He further alleged that because of such "religious activity," he "was made to feel as an

'outsider.'"  Id. ¶ 30.  Newdow sought both a declaration that President Bush had violated the

Establishment Clause by utilizing a clergyman in the 2001 Inauguration, and a permanent

injunction barring President Bush "from repeating this or engaging in any similar religious acts."

Id. at 7.

In response to President Bush's motion to dismiss, the Magistrate Judge issued findings

and recommendations concluding that Newdow had Article III standing to bring his action, but

recommending that the action be dismissed to the extent it challenged "permitting a chaplain (or

the President) from making any prayer at the Presidential Inauguration."  Newdow I (Magistrate

Judge, July 17, 2001), at 12.  The Magistrate Judge noted the long history of Christian prayers and

---

[4]  References to the judicial decisions in Newdow's prior action will be in the form
"Newdow I" followed by a parenthetical identification of the specific decision of the Magistrate
Judge or District Court.  The complaint in Newdow I will be referenced simply as "2001 Compl."

reverent references at Presidential inaugurations, and concluded that the framers did not view such inaugural prayers as violative of the Establishment Clause.  Id. at 8-9.  Because the parties had not specifically addressed Newdow's challenge to the content of the prayers at the 2001 Inauguration, the Magistrate Judge recommended against dismissal of that claim.  Id. at 10, 12.

After objections from both Newdow and President Bush, the District Court adopted the Magistrate Judge's findings and recommendations in full.  Newdow I (District Court, Sept. 28, 2001 Order).  Accordingly, although the action was dismissed to the extent it sought to prevent the President or a chaplain from saying a prayer at a future inauguration, the entire case was not dismissed.  President Bush then moved to dismiss the remaining claim relating to the specific content of the 2001 Inauguration prayers.  The Magistrate Judge then suggested that because courts cannot enjoin the President in the circumstances Newdow presented, the entire case should be dismissed.  Newdow I (Magistrate Judge, Dec. 28, 2001), at 13.  The Magistrate Judge concluded both that the courts lack constitutional authority to regulate the Presidential inauguration or what the President or his speakers said, and alternatively, that there was no Establishment Clause violation and Newdow did not have standing to challenge the content of future inaugural prayers.  Id. at 7, 13.

After Newdow filed objections together with a motion to amend his complaint in order to assert claims against Senator Mitch McConnell (as chair of the Joint Congressional Committee on Inaugural Ceremonies), the Magistrate Judge issued final findings and recommendations suggesting that the motion be denied because the court would lack constitutional authority to regulate Congressional participation in a Presidential inauguration just as it could not regulate

what the President or others said at an inauguration.  Newdow I (Magistrate Judge, Mar. 26,

2002), at 6.  The Magistrate Judge also observed, that suing Senator McConnell did not give

Newdow any greater standing to challenge the content of a prayer, and a federal court could not

enjoin the President, a senator or any other government official with regard to what was said at a

Presidential inauguration.  Id. at 6-7.  The Magistrate Judge therefore resubmitted his December

28, 2001 findings and recommendations, with supplementation, because adding Senator

McConnell or anyone else would not alter the recommendation in favor of dismissal.  The District

Court adopted the findings and recommendations and dismissed Newdow's case in its entirety.

Newdow I (District Court, May 23, 2002 Order), at 2.

The Ninth Circuit affirmed the judgment of the district court dismissing Newdow's action.

Newdow v. Bush, 89 Fed. Appx. 624, 2004 WL 334438, at *1 (9th Cir. Feb. 17, 2004).  That

court characterized Newdow's case as "alleging that the inclusion of clergy-led prayer at a

presidential inauguration is unconstitutional in general, and that the prayer offered . . . at the 2001

Inauguration of President Bush was unconstitutional in particular."  Id.  After noting that it had

jurisdiction and could affirm on any appropriate ground, the court stated the entirety of its ruling:

> Newdow lacks standing to bring this action because he does not
> allege a sufficiently concrete and specific injury.  *See Valley Forge*
> *Christian College v. Americans United for Separation of Church*
> *and State, Inc.*,  454 U.S. 464, 482-86 . . . (1982).
>
> The district court did not abuse its discretion in denying
> Newdow's motion to file an amended complaint because
> amendment would be futile.  *See Schmier v. U.S. Ct. of Appeals for*
> *the Ninth Circuit,* 279 F.3d 817, 824 (9th Cir. 2002).

Id.  Newdow did not seek any further review of the Ninth Circuit's decision.

II.   <u>Newdow's Current Challenge</u>

President Bush will be sworn in for his second term as the 43rd President at the January

20, 2005 Inauguration.  The Joint Congressional Committee on Inaugural Ceremonies ("JCCIC")

has been authorized to make all the necessary arrangements for the inauguration of President Bush

and Vice President Cheney.  <u>See</u> Senate Concurrent Resolutions 93 and 94, 150 Cong. Rec. S1695

(Feb. 26, 2004), 150 Cong. Rec. H1081-82 (Mar. 16, 2004); S. Con. Res. 2, 109th Cong.,

<u>reprinted in</u> 151 Cong. Rec. S7 (daily ed. Jan. 4, 2005).  The chair of the JCCIC is Senator Trent

Lott.  President Bush has appointed a private organization, the Presidential Inaugural Committee

("PIC"), to coordinate the ceremonial events connected with the inauguration.  <u>See</u> 36 U.S.C. §

501.

On December 16, 2004, Newdow contacted the PIC and was informed that there would be

chaplains at the 2005 Inauguration, although he was not told how many or who they would be.

<u>See</u> Compl. ¶ 41.  Newdow then filed this action and a motion for a preliminary injunction on

December 21, 2004, challenging the constitutionality of the use of any member of the clergy (or

other invited guests) to deliver prayers at the 2005 Inauguration.  <u>See</u> Compl. ¶¶ 35-47.  Included

as defendants in Newdow's action are President Bush, the JCCIC, Senator Lott, the PIC, and Craig

Jenkins, Executive Director of PIC.[5]

Newdow describes himself as "an atheist, who sincerely believes that there is no such

---

[5]  The suit also names as defendants the Joint Task Force-Armed Forces Inaugural
Committee, which is responsible for military ceremonial duties (<u>e.g.</u>, a military band and ushers)
at the inaugural ceremony, its Commander, and "one or more unnamed clergy (wo)men."  <u>See</u>
Compl. ¶¶ 12-13, 16.

thing as god, or God, or any supernatural force."  Id. ¶ 19; see Elk Grove, 124 S. Ct. at 2305-06.

He asserts that any acknowledgment of God ridicules, rather than solemnizes, public occasions,

Compl. ¶ 20, and alleges that at the 2001 Inauguration, Christian ministers gave sectarian

Christian prayers that violated the Establishment Clause, id. ¶¶ 23-25.  He contends that

witnessing such a religious exercise at the 2001 Inauguration made him "feel like a second class

citizen and a 'political outsider' on account of his religious beliefs," id. ¶ 26, which infringed upon

his fundamental right protected by the Establishment Clause to view government action without

having to confront government endorsement of religion, id. ¶ 27.  Newdow asserts that "[i]t is

presumed that Proposed Clergy's prayers [at the 2005 Inauguration] will make Plaintiff feel like an

'outsider' as well."  Id. ¶ 57.  According to Newdow,

> [t]he effect of the purely religious words uttered by [clergy at the
> 2001 Inauguration] was for Christian Americans to perceive them as
> an endorsement of their Christianity, and for non-Christian
> Americans, including plaintiff, to perceive the Pledge [sic] as a
> disapproval of their non-Christianity.  It is presumed that Proposed
> Clergy's prayers will have the same effect.

Id. ¶ 67.[6]  Newdow claims "a fundamental constitutional right to observe and participate in the

Nation's official ceremonies free from governmental endorsement of religion," and that he has a

ticket for and plans to attend the 2005 Inauguration, but desires to avoid being subjected to

government-endorsed religious dogma while there.  See id. ¶¶ 74-76.

The relief sought in Newdow's complaint includes a declaratory judgment that "utilizing

_____

[6]  Newdow's reference to "the Pledge" here and in an identical passage in his prior
complaint is an error reflecting that he has asserted the same claim of injury in various
Establishment Clause challenges he has initiated.

any clergymen (much less an openly Christian minister and an openly Christian pastor) in a

presidential inauguration" violates the Establishment and Free Exercise Clauses of the First

Amendment and the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb et seq.

Compl. at 16, ¶ I.  In addition, Newdow asks this Court to enjoin the defendants (or other

government officials) "from utilizing any clergymen to engage in any religious act," or

alternatively "from utilizing clergymen to engage in Christian religious acts," at the 2005

Inauguration or future Presidential inaugurations,  Id. at 16, ¶¶ II, III.

A briefing schedule on Newdow's motion for a preliminary injunction was proposed by the

parties and adopted by the Court.  That motion has been fully briefed, and both the federal

defendants and PIC have filed motions to dismiss as well.  A hearing was held on January 13,

2005.

## ANALYSIS

## I.      Preliminary Injunction Standard

In order to prevail on his application for a preliminary injunction, Newdow must

demonstrate (1) a substantial likelihood of success on the merits; (2) that he will suffer irreparable

harm absent the relief requested; (3) that other interested parties will not be harmed if the

requested relief is granted; and (4) that the public interest supports granting the requested relief.

Cobell v. Norton, 391 F.3d 251, 258 (D.C. Cir. 2004); Katz v. Georgetown Univ., 246 F.3d 685,

687-88 (D.C. Cir. 2001); Taylor v. Resolution Trust Corp., 56 F.3d 1497, 1505-06 (D.C. Cir.

1995); Washington Area Metro. Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 843

(D.C. Cir. 1977).  In determining whether to grant urgent relief, the Court must "balance the

strengths of the requesting party's arguments in each of the four required areas." CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 747 (D.C. Cir. 1995). "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." Id. It is particularly important for Newdow to demonstrate a substantial likelihood of success on the merits; where a plaintiff cannot show a likelihood of success on the merits, "it would take a very strong showing with respect to the other preliminary injunction factors to turn the tide in plaintiff['s] favor." Davenport v. Int'l Bhd. of Teamsters, AFL-CIO, 166 F.3d 356, 366-67 (D.C. Cir. 1999); Nat'l Head Start Ass'n v. Dep't Health and Human Servs., 297 F. Supp. 2d 242, 246 (D.D.C. 2004) (factors "must be balanced against each other, but it is especially important for the movant to demonstrate a likelihood of success on the merits").

Because preliminary injunctions are extraordinary forms of judicial relief, courts should grant them sparingly. Sociedad Adonima Vina Santa Rita v. United States Dep't of the Treasury, 193 F. Supp. 2d 6, 13 (D.D.C. 2001); see Dorfmann v. Boozer, 414 F.2d 1168, 1173 (D.C. Cir. 1969). The Supreme Court has stated that "'[i]t frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" Mazurek v. Armstrong, 520 U.S. 968, 972 (1997); accord Cobell, 391 F.3d at 258.

## II.   Likelihood of Success

### A.   Issue Preclusion

At the outset, the Court must consider several arguments raised by defendants that pertain

to whether it is appropriate for Newdow to bring this suit.  The first of these argument is issue

preclusion.  Defendants argue that Newdow is precluded from bringing this suit because he

previously brought essentially the same cause of action against President Bush in a suit that the

Ninth Circuit, in <u>Newdow I</u>, dismissed for a lack of standing because Newdow had not alleged a

concrete and particularized injury.  If issue preclusion is likely to bar Newdow's current suit, then

he cannot show a substantial likelihood of success on the merits.

      1.    Legal Standard

Under the doctrine of issue preclusion, "once a court has decided an issue of fact or law

necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a

different cause of action involving a party to the first case." <u>Allen v. McCurry</u>, 449 U.S. 90, 94

(1980); <u>see</u> <u>also</u> <u>Yamaha Corp. of Am. v. United States</u>, 961 F.2d 245, 254 (D.C. Cir. 1992).  The

purpose of the doctrine is judicial finality.  <u>See</u> <u>id</u>.  The preclusive effect of a prior ruling is

established if:  first, the same issue now being raised was "contested by the parties and submitted

for judicial determination in the prior case"; second, the issue was "actually and necessarily

determined by a court of competent jurisdiction in that prior case"; and third, preclusion does not

"work a basic unfairness to the party bound by the first determination." <u>Id</u>.  The prior adjudication

has preclusive effect even if it is erroneous.  <u>See</u> <u>Cutler v. Hayes</u>, 818 F.2d 879, 888 (D.C. Cir.

1987).

      2.    Newdow I

The first prong of issue preclusion requires review of the actual issues of fact or law

litigated in the prior suit and a determination whether resolution of any of those issues would

-10-

preclude the current litigation.  See Yamaha Corp., 961 F.2d at 254.  In his first action, Newdow

alleged that the prayer given at the 2001 Inauguration, which Newdow witnessed on television,

was a violation of the Establishment Clause.  2001 Compl. ¶ 12-13.  He requested that the court

declare that President Bush violated the Establishment Clause and enjoin him from repeating that

violation.  Id. at 7.  President Bush challenged Newdow's standing to bring such a suit.

    The Magistrate Judge concluded that Newdow had Article III standing to bring an action

seeking a total ban on prayers at inaugurations, and rejected President Bush's argument that

exposure to religious prayer on television is different than exposure in person.  See Newdow I

(Magistrate Judge, July 21, 2001) at 5, 7.  The Magistrate Judge noted that an inauguration is "a

historic event of national importance to which the public is invited, if not encouraged, to view on

television," and commented on the potential arbitrary nature of such a distinction, wondering if

people attending who could not actually see or hear the prayer read would have standing.  Id. at 5.

    Although the Magistrate Judge found standing, he concluded that the motion to dismiss

should be granted because it was not an Establishment Clause violation to have religious prayer at

an inauguration.  Id. at 9.  President Bush subsequently sought dismissal of the remaining claim --

the constitutionality of the actual 2001 inaugural prayer -- and in a December 28, 2001 decision

the Magistrate Judge concluded that the final claim also should be dismissed because the court

could not issue an injunction or declaratory relief against the President.  See Newdow I

(Magistrate Judge, Dec. 28, 2001), at 13.  Newdow sought to amend his complaint to include

Senator Mitch McConnell, chair of the JCCIC, but the Magistrate Judge found that amendment

would be futile because the court also could not enjoin a member of Congress with regard to what

is said at a Presidential inauguration.  Newdow I (Magistrate Judge, Mar. 26, 2002) at 6-7.  The

District Court adopted the findings of the Magistrate Judge and dismissed Newdow's action.

Newdow I (District Court, May 23, 2002 Order), at 2.

Newdow appealed to the Ninth Circuit, which affirmed the dismissal.  In a brief decision,

the Ninth Circuit held that "Newdow lacks standing to bring this action because he does not allege

a sufficiently concrete and specific injury.  *See Valley Forge Christian College v. Americans*

*United for Separation of Church and State, Inc.*, 454 U.S. 464, 482-86 .... (1982)."  Newdow v.

Bush, 2004 WL 334438, at *1.  The Ninth Circuit also upheld the district court's decision not to

allow amendment of the complaint as futile.  Id.

Several months later, Newdow brought this action against President Bush and others.  As

before, he claims that inaugural prayers violate the Establishment Clause, and as before, he asks

this Court to enjoin the practice of giving religious prayers at Presidential inaugurations.

Defendants maintain that Newdow has not alleged in this suit any new injury, law or facts

sufficient to overcome the preclusive effect of the Ninth Circuit decision holding that Newdow

had not alleged "a sufficiently concrete and specific injury" under Valley Forge Christian Coll. v.

Americans United for Separation of Church and State, Inc., 454 U.S. 464 (1982) ("Valley Forge").

A review of Newdow's two complaints shows direct parallels in the injury alleged by

Newdow.  In the Complaint filed in this Court, he alleges the following injuries:

- Being forced to confront ... religious dogma as a price to pay for observing a government ceremony is a substantial burden upon Plaintiff's Free Exercise right.  [Compl. ¶ 28]

- The 2001 prayers made Plaintiff - a minister, proponent and follower of a religious faith that specifically denies the existence of God and the veracity of Christianity - feel like an "outsider" on both accounts.  It is presumed that Proposed Clergy's prayers will make

Plaintiff feel like an "outsider" as well.  [Compl. ¶ 57]

•    The effect of the purely religious words uttered by [clergy at the 2001 Inauguration] was
     for Christian Americans to perceive them as an endorsement of their Christianity, and for
     non-Christian Americans, including Plaintiff, to perceive the Pledge [sic] as a disapproval
     of their non-Christianity.  It is presumed that Proposed Clergy's prayers will have the same
     effect.  [Compl. ¶ 67]

•    Wishing to avoid any government-sponsored religious dogmas - much less Christian
     monotheistic religious dogma - at this momentous life experience, Plaintiff is placed in the
     untenable position of having to chose between not participating in the presidential
     inauguration or being forced to countenance purely religious ideals that he expressly
     denies and that turn him into an 'outsider.'  [Compl. ¶ 76]

Plaintiff alleged virtually identical injuries in his complaint in <u>Newdow I</u>:

•    The effect of the Rev. Graham's purely religious words was for Christian Americans to
     perceive them as an endorsement of their Christianity, and for non-Christian Americans,
     including Plaintiff, to perceive the Pledge [sic] as a disapproval of their non-Christianity.
     [2001 Compl. ¶ 29]

•    Due to religious activity, Plaintiff - a minister of a religious faith that specifically denies
     the existence of God and the veracity of Christianity - was made to feel as an 'outsider.'
     [2001 Compl. ¶ 30]

Based on these virtually identical allegations of injury, in each case Newdow sought a declaration

and injunction barring prayer by invited clergy at Presidential inaugurations.[7]

     It appears, then, that Newdow is precluded from relitigating his standing to bring an

Establishment Clause action challenging inaugural prayers.  <u>See</u> <u>Cutler</u>, 818 F.2d at 889

("Principles of collateral estoppel clearly apply to standing determinations.").  Certainly the Ninth

---

     [7]  Newdow has clarified in his Reply that he is also injured because he will choose not to
attend the inauguration if religious prayers are given.  <u>See</u> Pl. Reply at 6.  This additional injury is
inconsistent with his Complaint, where he asserts that he will go to the Inauguration and that he
will be harmed by exposure to prayers.  He cannot simultaneously be injured by attending an
inauguration where prayers are read and by not attending the event because prayers will be read.

Circuit is a "court of competent jurisdiction." <u>See</u> <u>Yamaha Corp.</u>, 961 F.2d at 254.  Moreover, standing was raised, contested and actually decided in <u>Newdow I</u>.  Applying the Ninth Circuit's standing decision to this action would also not "work a basic unfairness to the party bound," as the record contains sufficient evidence that Newdow vigorously argued he had standing to bring his first suit.  <u>See</u> <u>id.</u> ("An example of such unfairness would be when the losing party clearly lacked any incentive to litigate the point in the first trial.").

> 3.     Curable Defect Exception

Although Newdow's present action would thus appear to be precluded by the prior Ninth Circuit decision, the inquiry does not end here.  This Circuit has recognized a "curable defect" exception to preclusion for jurisdictional dismissals.  <u>See</u> <u>Dozier v. Ford Motor Co.</u>, 702 F.2d 1189 (D.C. Cir. 1983).  The "curable defect" exception permits an action to proceed if the jurisdictional ground for dismissal of the original suit has been remedied by occurrences arising after the dismissal of the first action.  <u>Id.</u> at 1192.

In order for the "curable defect" exception to apply, a plaintiff must supply in the second suit a "precondition requisite" to the proceeding that was not alleged or proven in the original suit. <u>Id.</u>  The key to the "curable defect" exception is that the jurisdictional deficiency in the original suit, here a lack of standing because the alleged injury was not sufficiently concrete and specific, must be "remedied by *occurrences subsequent to the original dismissal*." <u>Id.</u> (emphasis in original); <u>see</u> <u>also</u> <u>Costello v. United States</u>, 365 U.S. 265, 284-88 (1961) (government's filing of an affidavit of good cause in a denaturalization proceeding); <u>Martin v. Dep't of Mental Hygiene</u>, 588 F.2d 371, 373 n.3 (2d Cir. 1978) (proper service of process); <u>Napper v. Anderson</u>, 500 F.2d

634, 637 (5th Cir. 1974) (change in residency adequate to invoke diversity jurisdiction).  The new

fact or occurrence must be separate and distinct from the past transaction that formed the basis for

the original cause of action.  See Dozier, 702 F.2d at 1192.  Accordingly, a mere "defect in

pleading" in the original complaint cannot be remedied through the "curable defect" doctrine.  Id.

Although Newdow's present Complaint and alleged injuries are virtually identical to those

in Newdow I, there are two "occurrences" that have arisen since the February 2004 decision by the

Ninth Circuit that could arguably suffice to prevent preclusion.  First, Newdow alleges

prospective injury arising from the 2005 Inauguration, rather than injury just from the 2001

Inauguration.  Second, Newdow alleges that he will actually attend the 2005 Inauguration, while

in 2001 he watched the on television.  Compare Compl. ¶ 75 ("Plaintiff plans to attend the

inaugural ceremonies, and already has a ticket reserved.") with 2001Compl. ¶ 28 ("Plaintiff

watched the inaugural ceremonies on television.").

The fact that Newdow is alleging injury arising from inaugural prayer in 2005 may be a

new occurrence as to an inquiry into the particular prayers, but that fact does not address the

jurisdictional deficiency in Newdow's prior suit.  The relevant question is not whether there is a

new prayer, as there certainly will be, but whether the existence of this new prayer remedies

Newdow's original standing deficiency.  See Dozier, 702 F.2d at 1192.  Plainly it does not.

Newdow does not allege that the 2005 prayer will cause a different type of injury.  Therefore, new

prayers in the 2005 Inauguration are not new "occurrences" for purposes of remedying the

jurisdictional deficiencies in Newdow's prior suit.

The other asserted new occurrence is Newdow's assertion that he will attend the 2005

Inauguration.  See Compl. ¶ 75.  Again, however, for this new fact to trigger the "curable defect"

exception, it must remedy the jurisdictional deficiency.  This Court agrees with the assessment of

the Magistrate Judge in Newdow I that there is no meaningful distinction between watching and

hearing an inaugural ceremony on television and being present in Washington for it.  See Newdow

I (Magistrate Judge, July 17, 2001), at 5.  In the prior suit, Newdow agreed with this view, arguing

before the Ninth Circuit that "media exposure unquestionably provides standing to those who are

affected."  See Reply Br. of Pet., Newdow v. Bush, No. 02-16327 (9th Cir.) available at 2003 WL

22670037, at *9.

Given the national broadcast and national audience of the inaugural ceremonies, and the

cause of the injury alleged -- the reading of prayer -- it is difficult to believe that physical presence

creates a different injury than the one Newdow allegedly suffered watching the 2001 event on

television.  Not only is the television viewer more likely to hear and see the reading of the prayer

than a person standing or sitting far away from the podium on the Capitol grounds, but a mature

adult such as Newdow is unlikely to suffer any meaningful coercion from his physical presence in

the audience so as to enhance his injury.[8]  Indeed, Newdow has not persuasively argued that he

will be subject to any unique coercion through attendance.[9]  Therefore, this Court doubts that

---

[8]  The television versus physical presence distinction implicates the reality of the national
inauguration -- it is very crowded in Washington for the event.  How is the Court to treat, for
injury-in-fact purposes, those in attendance in Washington who are so far away from the event at
the Capitol that they are forced to watch and hear the inauguration on one of the many "jumbo
televisions" provided to aid the viewing public?  And what of those who come to Washington for
the inaugural ceremonies, but opt out at the last minute to avoid the snow and freezing
temperatures on January 20 and instead watch the Inauguration on television in their hotel lounge?

[9]  The inaugural setting for mature adults voluntarily in attendance is far different from the
coercive public school setting for students effectively forced to attend, as recognized by the

Newdow's new allegation of attending the 2005 Inauguration cures the prior jurisdictional defect

of a lack of standing, as found by the Ninth Circuit.  The question for issue preclusion purposes is

not whether that court was right or whether Newdow actually does have standing, but rather

whether his intended in-person attendance in 2005 makes a difference for standing and thus comes

within the curable defect exception.  The Court concludes it probably does not, and therefore issue

preclusion based on <u>Newdow I</u> casts grave doubt on his likelihood of succeeding on the merits in

this action.

B.      Standing

Even if Newdow's current action is not precluded by the Ninth Circuit's judgment in

<u>Newdow I</u>, he faces sizable hurdles on the issue of standing.[10]  The question of standing is a

threshold determination of  "whether the litigant is entitled to have the court decide the merits of

the dispute or of particular issues."  <u>Warth v. Seldin</u>, 422 U.S. 490, 498 (1975).  The power of the

federal judiciary to rule upon the "constitutionality of legislative or executive acts," is not absolute

but is limited to actual cases and controversies.  <u>See</u> <u>Valley Forge</u>, 454 U.S. at 471.  The power of

the judiciary exists only to redress those injuries accruing to the plaintiff, even though others "may

benefit collaterally."  <u>Warth</u>, 422 U.S. at 499.  The exercise of jurisdiction is weighed against a

"'deeply rooted' commitment" of the courts "'not to pass on questions of constitutionality' unless

adjudication of the constitutional issue is necessary."  <u>Elk Grove</u>, 124 S. Ct. at 2308 (quoting

<u>Spector Motor Serv., Inc. v. McLaughlin</u>, 323 U.S. 101, 105 (1944)).

Supreme Court in the school prayer cases discussed <u>infra</u>.

[10]  Newdow raised the prospect of taxpayer standing in his Complaint, but withdrew that
claim in his Reply.

Therefore, it is incumbent upon every plaintiff to allege that the challenged conduct caused the plaintiff to suffer an injury that can be redressed by the court.  See Elk Grove, 124 S. Ct. at 2308.  This is a burden borne by the plaintiff, and each element of standing "must be supported in the same way as any other matter upon which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of litigation."  Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992).  To have standing, plaintiff must first allege that he "suffered an 'injury in fact' -- an invasion of a legally protected interest which is (a) concrete and particularized ... and (b) actual or imminent, not 'conjectural' or 'hypothetical' ...."  Id. at 560 (citations omitted).  "Second, there must be a causal connection between the injury and the conduct complaint of."  Id. (quotations omitted).  "Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  Id. (quotations omitted). Examination of Newdow's claim of standing to bring this action raises serious injury-in-fact and redressability issues.

      1.     Injury-in-fact

The first prong of Article III standing is injury-in-fact.  Newdow has alleged that he finds religious prayers offensive and will be made to feel like an outsider if religious prayers are read at the 2005 Inauguration.  See Compl. ¶¶ 21, 56-57, 76.  However, courts generally have been reluctant to grant standing in cases where the plaintiff alleges nothing more than hurt feelings or disagreement with an action.  In Valley Forge, the Court stated that the "psychological consequence presumably produced by observation of conduct with which one disagrees ... is not an injury sufficient to confer standing under Article III, even though the disagreement is phrased

in constitutional terms." 454 U.S. at 485-86.  The Court emphasized that injury for purposes of standing "is not measured by the intensity of the litigant's interest or fervor of his advocacy." Id. at 486.

Newdow has alleged injuries that are not obviously particularized or specific to him, but are instead generalized grievances shared by everyone who might dislike the inclusion of religious prayer in Presidential inaugurations.  When faced with such a widely-shared injury, the Supreme Court has observed that "where large numbers of Americans suffer alike, the political process, rather than the judicial process, may provide the more appropriate remedy for the widely shared grievance." Akins v. FEC, 524 U.S. 11, 23 (1998) (citing Warth, 422 U.S. at 500).  Still, the fact that an injury is felt potentially by a large portion of the population does not automatically disqualify it as a basis for standing.  Id. at 21-23 (finding standing for voters who allege a denial of information requested in accordance with a statute).  Hence, although widely shared injuries are typically of an "abstract and indefinite nature" and therefore not "concrete and particularized," that is not so in every circumstance.  It is possible for a plaintiff to allege an injury that, although widely-shared by many, is particularized and concrete.  See id.

Newdow has alleged facts that potentially transform his injury from an abstract "common concern for obedience to the law" into a more concrete and particularized injury.  He has alleged that he is a citizen of the United States and an atheist who does not believe in any God, regardless of religious sect.  See Compl. ¶ 19.  This belief, he contends, puts him in a small minority of the United States -- roughly 4% to 9%.  See Compl., App. C.  In addition, Newdow has viewed the inaugural celebration in the past and alleges that he will do so in the future.  Compl. ¶¶ 26, 75.

-19-

Finally, Newdow has asserted that he was offended and made to feel like a "second class citizen" and "political outsider" as a result of observing the religious prayers at the 2001 Inauguration.  Id. ¶¶ 24, 26.

Newdow also emphasizes his intent to physically attend the 2005 Inauguration and his ticket for the event as an additional basis for an injury.  As discussed above, it is not self-evident to this Court that attendance at the Inauguration, or possessing a ticket, gives Newdow an injury any different from those viewing on television.  The injured feelings or stigmatization are no different, it would seem, than hearing and "seeing" a prayer live from the speaker's mouth (or by a loud speaker and large screen) or from a television, especially for a mature adult such as Newdow. Whether he is in his home, elsewhere observing television, or seated in a group of several thousand listening to a loudspeaker and watching a screen would appear to be to make no difference.  For a mature adult and admitted atheist, coercion would seem unlikely in any setting.

Hence, there remains a strong argument that Valley Forge should control the injury-in-fact inquiry.  Defendants argue that Newdow is merely alleging a "psychic injury" from the observance of a prayer with which he disagrees.  This view was adopted in Newdow v. Eagen, 309 F.Supp.2d 29, 34-35 (D.D.C. 2004), where Newdow's challenge to the use of chaplins in the United States Congress was dismissed for lack of standing.  Quoting from Valley Forge, the court found that Newdow's asserted right to observe Congress free of religion did not give rise to standing.  Id.  So too, the Ninth Circuit in Newdow I, examining very similar alleged injuries, found no standing based on Valley Forge.

Nonetheless, it is true that federal courts, notwithstanding the important Article III

standing considerations identified in <u>Valley Forge</u>, have found injury-in-fact where a complaint is

founded upon observing offensive religious materials.  In such cases, the plaintiffs have alleged a

"personal connection" with the challenged conduct, usually in the plaintiff's home or community.

<u>See</u>, <u>e.g.</u>, <u>Suhere v. Haywood County</u>, 131 F.3d 1083, 1087 (4th Cir. 1997) (county resident had

standing to challenge Ten Commandment display in county courthouse); <u>Washegesic v.

Bloomingdale Pub. Sch.</u>, 33 F.3d 679, 681-83 (6th Cir. 1994) (former student had standing to

confront religious portrait at school he formerly attended); <u>Saladin v. City of Milledgeville</u>, 812

F.2d 687, 692-93 (11th Cir. 1987) (plaintiff who was part of city and received mail from city

could challenge religious symbols on city's seal); <u>Arizona Civil Liberties Union v. Dunham</u>, 112

F.Supp. 2d 927, 935 (D. Ariz. 2000) ("The genuine feeling of exclusion from the community in

which one resides, and the deep offense perceived from an insult to one's religious view

committed by the government in one's community, satisfy the injury prong of standing.").[11]

     This concept of standing limited to those with a "personal connection" to the complained

of conduct is generally not present in cases dealing with prayer.  Still, in most cases involving

prayer, plaintiffs implicitly have alleged a "personal connection" with the event at which the

prayer is read.  <u>See</u> <u>Lee v. Weisman</u>, 505 U.S. 577, 584 (1992) (plaintiff had standing as a

currently enrolled student in the school system); <u>cf.</u> <u>Doe v. Madison School Dist. No. 321</u>, 177

---

     [11]  These cases have sometimes relied on the frequent contact between the plaintiffs and
the  offensive conduct or display.  <u>See</u> <u>Suhre</u>, 131 F.3d at 1090 (noting the numerous times the
plaintiff came into contact with the display).  However, in the case of a prayer, such
considerations are inapposite.  Of course, it cannot be said that the plaintiffs in <u>Lee v. Weisman</u> or
other school prayer cases were in frequent contact with the challenged prayers, but there is an
additional coercive effect present in the school setting.

F.3d 789, 797 (9th Cir. 1999) (en banc) (parent lacked standing to challenge prayer at graduation when parent did not have any children currently in the school system).  There is a legitimate question whether Newdow has established a "personal connection" with the Inauguration.  Although experiencing the prayer read in person rather than on television does not appear to be a meaningful distinction, there is an argument that actual attendance could satisfy a personal connection.  Tickets are issued and Newdow has taken the steps to obtain one of those tickets, and he plans to be at the event.

This personal connection inquiry also requires consideration of the event itself.  A Presidential inauguration is certainly national, perhaps uniquely so.  The entire country is invited to view the swearing in of the President.  It is a day to celebrate the new presidency, and permits the country to unite after a potentially fractious election.  It is also nationally televised live for all citizens to view.  As such, there is an argument that all those who "participate" in a Presidential inauguration, whether by television, radio, or in person, have a personal connection to the event sufficient to create an injury-in-fact, if they were injured through that participation.[12]  Therefore, the unique nature of the Inauguration may create a personal connection for Newdow, either by physically attending or merely watching on television, sufficient to establish Article III standing.[13]

2.      Redressability

---

[12]  It is also true that if all those who "participate" in the inaugural ceremonies have a personal connection, then those who avoided the Inauguration because of religious prayer would likewise have an injury-in-fact.

[13]  When asked at the hearing whether defendants' position meant that there is no one who would have standing to challenge religious prayer (perhaps overtly sectarian or even proselytizing) at a Presidential inauguration, counsel for the federal defendants conceded that was probably the case.

Although Newdow thus has a colorable claim of injury-in-fact, there remains a serious doubt that this Court can redress the alleged injuries suffered by Newdow.  In his motion for a preliminary injunction, Newdow asks this Court to enjoin defendants from allowing any clergy (or other invited guest) to give any religious prayer at the 2005 Presidential Inauguration.  In his Reply, he argues that the Court could redress his injuries by merely declaring "that chaplain-led prayer at government ceremonies violates the Establishment Clause."  Pl. Reply at 9.

Redressability is one of the three elements of Article III standing.  See Lujan, 504 U.S. at 561.  An injury is redressable by the court if it is "'likely,' as opposed to merely 'speculative,' that the injury will be 'redresseed by a favorable decision.'"  Id.  To redress Newdow's alleged injuries, the Court would need to issue an injunction that would prevent the reading of religious prayers at the Inauguration.  One question is to which, if any, of the defendants could an injunction issue that would achieve redress for Newdow.

There are a number of defendants in this action: President Bush; the JCCIC; Senator Trent Lott; the Joint Task Force - Armed Forces Inaugural Committee ("JTF-AFIC"); Major General Galen B. Jackman; the PIC; Greg Jenkins, Executive Director of PIC; and one or more unnamed clergy (wo)men.  Newdow alleges that President Bush has "ultimate decision-making power" in planning the inaugural ceremony, including the power to decide who will participate in the ceremony.  See Compl. ¶¶ 39, 44.  President Bush also selects the clergy to give the invocation. Id. ¶ 40.  Newdow alleges that PIC is "quasi-governmental" and Greg Jenkins "will see to it that the President's choices as to Proposed Clergy are able to deliver their religious prayers."  Id. ¶¶ 14, 45.  Senator Lott and the JCCIC provide PIC the "means to access and utilize the

government's property."  Id. ¶ 46.  Finally, Newdow alleges that Major General Jackman and the

JTF-AFIC "will provide the necessary logistical and equipment support so that Proposed Clergy

will be able to deliver their religious prayers during the inauguration ceremony."  Id. ¶ 47.

Defendants challenge some of Newdow's factual allegations.  PIC argues that they are a

private entity that operates at the "pleasure" of the President-Elect.  See PIC Mem. at 8;

Declaration of Gregory J. Jenkins ("Jenkins Dec.") ¶¶ 2-3.  Furthermore, PIC asserts that it is

responsible for planning, financing and executing all events in connection with the inauguration.

See Jenkins Dec. ¶ 6.  PIC's sole responsibility for the swearing in ceremony is to implement the

President-Elect's choices of who will speak at the ceremony, including inviting and facilitating the

President-Elect's choice of clergy.  Id. ¶ 7.  The JTF-AFIC does not provide a chaplain or any

other support or assistance for any clergy at the Inauguration.  See Declaration of Thomas L.

Groppel ¶ 8.

Reviewing the facts in the record, the only party against whom an injunction would redress

Newdow's injury is President Bush.  He has ultimate decision-making power in selecting speakers

for the Inauguration, including clergy.  See Compl. ¶ 39.  There is nothing in the record before the

Court that would indicate that another defendant could prevent the President from inviting clergy

of his choosing to give a religious prayer.  At the hearing on the motion for preliminary injunction,

Newdow conceded that only an injunction against the President can truly redress his injuries.

The prospect of this Court issuing an injunction against the President raises serious

separation of powers concerns.  There is longstanding legal authority that the judiciary lacks the

power to issue an injunction or declaratory judgment against the co-equal branches of the

government -- the President and the Congress.  See Mississippi v. Johnson, 71 U.S. 475, 500

(1866) ("Neither [the Congress or President] can be restrained in its actions by the judicial

department; though the acts of both, when performed, are, in proper cases, subject to its

cognizance."); see also Franklin v. Masssachusetts, 505 U.S. 788, 802-03 (1992) (plurality

opinion) ("In general, 'this court has no jurisdiction of a bill to enjoin the President in performance

of his official duties.'" (quoting Mississippi v. Johnson, 71 U.S. at 500));  Commonweath of

Massachusetts v. Mellon, 262 U.S. 447, 487 (1923) ("general rule is that neither department may

invade the province of the other and neither may control, direct, or restrain the action of the

other"); Clinton v. Jones, 520 U.S. 681, 718-19 (1997) (Breyer, J. concurring) (acknowledging

"the apparently unbroken historical tradition ... implicit in the separation of powers that a

President may not be ordered by the Judiciary to perform particular Executive acts" (quoting

Franklin, 505 U.S. at 802-03)); Swan v. Clinton, 100 F.3d 973, 978 (D.C. Cir. 1996) (noting that

the Supreme Court has issued a "stern admonition" that injunctive relief against the President

personally is an "extraordinary measure").

     The question of enjoining the President was specifically addressed in Franklin v.

Massachusetts.  There, Massachusetts sought to enjoin the President from submitting the census

statement to Congress in accordance with 2 U.S.C. § 2a(a).  See 505 U.S. at 792.  Although the

Supreme Court, in a plurality opinion, found that a court could redress the plaintiff's injury by

enjoining the Secretary of Commerce, the Court stated that "a grant of injunctive relief against the

President himself is extraordinary and should have raised judicial eyebrows." Id. at 802.  The

plurality also noted that generally courts would have no jurisdiction to enjoin the President in the

performance of his official duties.  Id. at 803.  Justice Scalia, concurring in the decision, echoed

the sentiments of the plurality: "I think it is clear no court has authority to direct the President to

take an official act."  Id. at 826; see also Clinton v. Jones, 520 U.S. at 718-19 (Breyer, J.,

concurring).  The D.C. Circuit in Swan v. Clinton articulated the important separation of powers

issue implicated if the judiciary were to enjoin the President:

> The reasons why courts should be hesitant to grant such relief [an injunction
> against the President personally] are painfully obvious; the President, like
> Congress, is a coequal branch of government, and for the President to "be ordered
> to perform particular executive ... acts at the behest of the Judiciary" at best creates
> an unseemly appearance of constitutional tension and at worst risks a violation of
> the constitutional separation of powers.

100 F.3d at 977.

Newdow has also raised the possibility of this Court simply issuing a declaratory judgment

against the President.  To begin with, this makes no sense with respect to his current action for a

preliminary injunction.  Moreover, the same principles foreclose a declaratory judgment against

the President as well as injunctive relief.  See, e.g., Swan, 100 F.3d at 977 ("Although the

following discussion is couched in terms of our ability to grant injunctive relief against the

President, similar considerations regarding a court's power to issue relief against the President

himself apply to Swan's request for a declaratory judgment.").  As Justice Scalia explained in

Franklin v. Massachusetts:

> For similar reasons, I think we cannot issue a declaratory judgment against the
> President.  It is incompatible with his constitutional position that he can be
> compelled to defend his executive actions before a court ....  The President's
> immunity from such judicial relief is "a functionally mandated incident of the
> President's unique office, rooted in the constitutional tradition of the separation of
> powers and supported by our history."

505 U.S. at 827 (Scalia, J., concurring) (quoting Nixon v. Fitzgerald, 457 U.S. 731, 749 (1982)).

The immunity of the President from such a judicial order is a legal issue of no little moment, resting near -- if not directly on -- the fault line separating the at times competing constitutional themes of the separation of powers and checks and balances.  The immunity is not without its exceptions, and the outer boundaries of the immunity remain unclear.  The Supreme Court in Franklin left open the question, for example, whether the judiciary could enjoin the President in his ministerial functions.  See Franklin, 505 U.S. at 800.  Likewise, the question whether the President may be enjoined for actions taken outside the compass of his official duties appears to remain unresolved.  See Clinton v. Jones, 520 U.S. at 705-06.  Courts have also "bypassed" the immunity of the President where plaintiff's injury "can be redressed by injunctive relief against subordinate officials."  Swan, 100 F.3d at 977.

However, none of these exceptions to presidential immunity appear, at least on the present record, to help Newdow here.  The President's selection of clergy at his Inauguration cannot plausibly be considered ministerial.  See Mississippi v. Johnson, 71 U.S. at 498-99 ("[A] ministerial duty ... is one in respect to which nothing is left to discretion.").  The Inauguration also does not reasonably appear to be outside the President's official duties; indeed, whatever extent that is the case, the selection of clergy would lose the cloak of state action that allows Newdow to bring his challenge under the Establishment Clause in the first place.[14]  The federal defendants concede that the challenged conduct here is taken by the President in his official capacity, and Newdow agrees.  Finally, there are no other officials -- subordinate or otherwise -- to whom the

---

[14]  See infra note at 33.

Court could issue an order that would redress the constitutional violation alleged by Newdow in this case.

Newdow urges the Court to read an exception into the immunity of the President from injunctive relief for instances where he is claimed to have violated the Constitution, but there is no support at all for such an exception,[15] and the nature of the claimed violation at any rate does not alter the crucial point that, in the words of the D.C. Circuit, it is an "extraordinary measure" to issue an injunction against the President.[16]  Defendants contend that there has never been an injunction against the President issued and sustained by the federal courts, and this court is not aware of any.[17]  Therefore, the Court's grave concerns about its power to issue an injunction against the President, which is the only method of redressing Newdow's alleged injuries, places in peril Newdow's standing to bring this action.  Without redressability and therefore standing,

---

[15]  Newdow seizes on language in Franklin stating that "the President's actions may still be reviewed for constitutionality," 505 U.S. at 801, but this statement was in the context of a discussion whether review is available for abuse of discretion under the Administrative Procedure Act and the Constitution, or only directly under the Constitution.  The discussion of redressability and the immunity of the President from injunctive or declaratory relief came later in the opinion; indeed, it is notable that Franklin itself involved a challenge under Article I, § 2, cl. 3 of the Constitution.  See id. at 790.

[16]  Perhaps the words of Justice Scalia in Webster v. Doe, 486 U.S. 592 (1988), should counsel this Court, as they did the Magistrate Judge in Newdow I (Magistrate Judge, December 28, 2001).  In dissent, on a political question issue unrelated to the issues in this case, Justice Scalia stated: "It seems to me clear that courts would not entertain ... an action for backpay by a dismissed Secretary of State claiming the reason he lost his Government job was that the President did not like his religious views -- surely a colorable violation of the First Amendment."  Webster, 486 U.S. at 613-14 (Scalia, J. dissenting).

[17]  Newdow was only able to point to Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579 (1952), but even there the injunctive remedy was directed to the Secretary of Commerce, and the looming separation of powers clash was avoided in the end.

Newdow would be unable to succeed on the merits of his claims.

### C.      The First Amendment Claims

Even if Newdow were able to overcome the hurdles posed by consideration of issue preclusion and standing, he would face an additional set of difficulties in trying to prove that a religious prayer at the 2005 Inauguration will violate the United States Constitution.  In considering the merits of his claim, it is important to note that the contents of the 2005 inaugural prayers remain unknown.  As a result, Newdow -- an avowed atheist -- is led in his motion for a preliminary injunction to request an order prohibiting any prayer by anyone other than the President.[18]  He claims that any such prayer would infringe upon his rights under the Establishment and Free Exercise Clauses, as well as the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 20000bb.  It is the claim under the Establishment Clause, however, that forms the heart of Newdow's challenge, and so it is to that claim that the Court turns first.

For decades, the Supreme Court has tested the constitutionality of state action under the Establishment Clause pursuant to a standard first articulated in Lemon v. Kurtzman, 403 U.S. 602 (1971).  This test provides that an action is lawful only if it has a "secular . . . purpose" and its "principal or primary effect" is one "that neither advances nor inhibits religion."[19]  Id. at 612-13.

---

[18]  Newdow seeks a wider range of remedies in his Complaint, including an order enjoining defendants from specifically utilizing *clergymen* to engage in any *Christian* (or in the alternative, any other) religious acts at the inauguration.  See Compl. at 16, ¶¶ II-III.  In his recent Reply, he also shifts his argument for preliminary injunctive relief to focus more on prohibiting overtly Christian prayer.

[19]  In its initial form, the test also asked whether the state action fosters "an excessive government entanglement with religion."  Lemon, 403 U.S. at 612-13.  The Supreme Court has since folded this question into the "effect" prong of the inquiry.  See Agostini v. Felton, 521 U.S. 203, 233 (1997).

Although often criticized, and even occasionally ignored, the <u>Lemon</u> test remains viable law, and therefore serves to this day as the governing standard for assessing the constitutionality of most state-sponsored religious activities under the Establishment Clause.  <u>See</u> <u>Santa Fe Independent Sch. Dist. v. Doe</u>, 530 U.S. 290 (2000) (applying <u>Lemon</u> test to invalidate school district policy allowing student-led, student-initiated prayer before public high school football games); <u>Lee</u>, 505 U.S. at 587 ("[W]e do not accept the invitation . . . to reconsider our decision in <u>Lemon v. Kurtzman</u>.").[20]

There are exceptions to the <u>Lemon</u> test, however, and one of those exceptions, reflected in <u>Marsh v. Chambers</u>, 463 U.S. 783 (1983), is of particular relevance here.  In that case, the Supreme Court upheld the Nebraska legislature's practice of opening each session with a prayer offered by a chaplain paid with public funds.  In its analysis, the Court did not mention <u>Lemon</u> even once.  Instead, the Court undertook an extensive inquiry into the history of legislative prayer, and concluded that the "opening of sessions of legislative and other deliberative public bodies with prayer is deeply embedded in the history and tradition of this county."  <u>Id.</u> at 786-87.  The Court noted that "the First Congress, as one of its early items of business, adopted the policy of selecting a chaplain to open each session with prayer," and that the "practice of opening sessions with prayer has continued without interruption ever since that early session of Congress."  <u>Id.</u> at

---

[20]  <u>See</u> <u>also</u> <u>Bonham v. District of Columbia Library Admin.</u>, 989 F.2d 1242, 1243 (D.C. Cir. 1993) (describing the <u>Lemon</u> test as the "gravamen of Establishment Clause claims") (quoting <u>United Christian Scientists v. First Church of Christ</u>, 829 F.2d 1152, 1161 (D.C. Cir. 1987)); <u>American Jewish Congress v. Corp. for Nat'l and Comm. Serv.</u>, 323 F. Supp. 2d 44, 56 (D.D.C. 2004) (applying <u>Lemon</u> test and characterizing it as the "touchstone for evaluating church-state relations under the Establishment Clause").

787.

The Marsh Court declined to read the "Establishment Clause of the Amendment to forbid what [its Framers] had just declared acceptable." Id. at 790.   Citing the "unambiguous and unbroken history of more than 200 years," the Court held that the invocation of divine guidance "on a public body entrusted with making the laws is not, in these circumstances, an 'establishment' of religion." Id. at 791.   Addressing the concern that the prayer was in the "Judeo-Christian" tradition,[21] the Court explained that the "content of the prayer is not of concern to judges where, as here, there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief." Id. at 794-95.   "That being so," Marsh concluded, "it is not for us to embark on a sensitive evaluation or . . . parse the content of a particular prayer." Id.

The Supreme Court had occasion to address Marsh several years later in County of Allegheny v. ACLU Greater Pittsburgh Chapter, 492 U.S. 573 (1989).   A divided Court, in a series of fractured opinions, allowed under the Establishment Clause a combined holiday display of a Chanukah menorah, a Christmas tree, and a sign saluting liberty, but found unconstitutional a creche standing alone on the staircase of the county courthouse.   In an opinion dissenting from the creche portion of the Court's decision, Justice Kennedy (joined by three other Justices) maintained

---

[21]   The text of one of the prayers in Marsh read:  "For ties that continue to bind us together, even when the going is rough, for common purposes we continue to recognize as larger than we are, even when the business at hand taxes our patience and our constituents; for the privilege of sharing in the inspirations--as well as the frustrations--of events which make headlines ... we now ask Your help, O Lord our God." Snyder v. Murray City Corp., 159 F.3d 1227, 1234 n.11 (10th Cir. 1998) (quoting Joint Appendix, Marsh v. Chambers, 463 U.S. 783 (1983), at 93-94).

that he "cannot comprehend" how the creche can be invalid in light of the Court's reasoning and holding in Marsh.  See County of Allegheny, 492 U.S. at 664 (Kennedy, J., concurring in part and dissenting in part).

Justice Blackman, writing the opinion of the Court on behalf of himself and four other Justices, responded to Justice Kennedy's invocation of Marsh.  Justice Blackmun explained that the Court had recognized in Marsh that "not even the 'unique history' of legislative prayer can justify contemporary legislative prayers that have the effect of affiliating the government with any one specific faith or belief."  Id. at 603 (quoting Marsh, 463 U.S. at 791).  Justice Blackman noted that the legislative prayers in Marsh did not violate this principle "because the particular chaplain had 'removed all references to Christ.'"  Id. at 603 (quoting Marsh, 463 U.S. at 793 n.14).  He explained that there is accordingly a difference between "a specifically Christian symbol, like a creche, and more general religious references, like the legislative prayers in Marsh."  Id. at 603.  However "history may affect the constitutionality of nonsectarian references to religion by the government," Justice Blackman concluded, "history cannot legitimate practices that demonstrate the government's allegiance to a particular sect or creed."  Id. at 604.[22]

The Supreme Court declined once again to apply Marsh in Lee v. Weisman, in which the inclusion of a clergy-led non-sectarian prayer in the graduation ceremonies of city public schools was invalidated.  In Lee, the Court noted the "heightened concerns with protecting freedom of conscience from subtle coercive pressures" in public schools.  505 U.S. at 592.  The Court

---

[22]   Justice Blackman noted as well that "[l]egislative prayer does not urge citizens to engage in religious practices, and on that basis could well be distinguishable from an exhortation from government to the people that they engage in religious conduct." Id. at 603 n.52.

explained that "[t]he atmosphere at the opening of a session of a state legislature where adults are free to enter and leave with little comment and for any number of reasons cannot compare with the constraining potential of the one school event most important for the student to attend." Id. at 597.  Noting that the "influence and force" in a formal school graduation are "far greater" than the practice condoned in Marsh, the Court declined to apply Marsh to the circumstances of a school prayer.  See id. at 597-98.  Indeed, the Court went out of its way to stress that the "sole question" addressed was graduation ceremonies where "young graduates who object are induced to conform." Id. at 599.  The Court applied the Lemon test intead, and invalidated the school graduation prayer policy.  See id. at 584.

Courts have applied the reasoning of Marsh to uphold prayer by a paid legislative chaplain at the United States Congress, see Murray v. Buchanan, 720 F.2d 689, 689 (D.C. Cir. 1983) (en banc); Newdow v. Eagen, 309 F. Supp. 2d 29 (D.D.C. 2004),[23] and prayer by a military chaplain at Army bases, see Katcoff v. Marsh, 755 F.2d 223 (2d Cir. 1985), but have declined to extend the decision to prayer by a state court judge to open each day in court, see North Carolina Civil Liberties Union Legal Found. v. Constangy, 947 F.2d 1145, 1147-49 (4th Cir. 1991), or prayer at town council and school board meetings, at least in certain circumstances, see Coles v. Cleveland

---

[23]   Neither of these cases discusses the point, but it is notable that the legislative prayers at the U.S. Congress are overtly sectarian.  See Steven B. Epstein, Rethinking the Constitutionality of Ceremonial Deism, 96 Colum. L. Rev. 2083, 2106 (1996) ("within the last six years alone, over two hundred and fifty opening prayers delivered by congressional chaplains have included supplications to Jesus Christ"); Kurtz v. Baker, 630 F. Supp. 850, 860-61 (D.D.C. 1986) (suggesting that the evidence before it indicating the sectarian nature of the congressional chaplain's prayer calls into question the legality of the prayer under Marsh), rev'd on other grounds, 829 F.2d 1133 (D.C. Cir. 1987).

Board of Educ., 171 F.3d 369, 371 (6th Cir. 1999).[24]  The question for this Court -- at least in the first instance -- is whether the circumstances of prayer at the Presidential inauguration bring this case within the ambit of the Marsh exception to the general Establishment Clause jurisprudence.

Newdow insists at the outset that this case is closer to the Supreme Court's recent school prayer decisions than to Marsh and therefore should be goverened by those decisions.  He relies most heavily on Lee and on Santa Fe.  Newdow quotes the Court in these decisions for statements such as "the religious liberty protected by the Constitution is abridged when the State affirmatively sponsors the particular religious practice of prayer" and "though the First Amendment does not allow the government to stifle prayers which aspire to these ends, neither does it permit the government to undertake that task for itself."  Lee, 505 U.S. at 589.  Newdow maintains that the decision in Marsh can have little remaining vitality in light of such language.

The Supreme Court has frequently emphasized the unique problems posed by prayer in schools, and it is plain from a reading of Lee and the other decisions cited by Newdow that the Court believed that its school prayer decisions could co-exist with its endorsement of ceremonial deism in Marsh.  See Lee, 505 U.S. at 596 ("Inherent differences between the public school system and a session of a state legislature distinguish this case from Marsh v. Chambers."); Edwards v. Aguillard, 482 U.S. 578, 583 n.4 (1987) (emphasizing that Marsh analysis "is not useful in determining the proper roles of church and state in public schools, since free public education was virtually nonexistent at the time the Constitution was adopted").  Indeed, a judge of

_____

[24]  In these latter cases, the court turned to the Lemon test after concluding that the case fell outside of Marsh.  See Coles, 171 F.3d at 384-85; Constancy, 947 F.2d at 1149-52.

this Court recently held that Marsh was not overruled by Lee and Santa Fe, and this Court sees no reason to depart from that conclusion.  See Newdow, 309 F. Supp. 2d at 40-41.

This leaves Newdow to argue that the circumstances in this case do not resemble those of the legislative prayer upheld in Marsh, but are instead closer to a conventional Establishment Clause case -- and in particular the school prayer cases -- where the Lemon test is routinely applied.  In light of the jurisprudence of the Supreme Court, and the way that lower courts have read and applied Marsh, this argument faces several obstacles, particularly on the limited preliminary injunction record.

First, the Marsh test has been read to govern those acts of government-sponsored religious activity that are "deeply embedded in the history and tradition of this country."  Marsh, 463 U.S. at 786.[25]  As a general matter, the courts that have declined to apply Marsh to a particular act on the basis of an insufficient historical tradition have done so where the activity at issue cannot be traced to the founding of the country and the adoption of the Bill of Rights.  See, e.g., Mellen v. Bunting, 327 F.3d 355, 368 (4th Cir. 2003) (finding Marsh inapplicable to supper prayers at Virginia Military Institute because "public universities and military colleges, such as VMI, did not exist when the Bill of Rights was adopted"); Glassroth v. Moore, 335 F.3d 1282 (11th Cir. 2003) (finding Marsh inapplicable to display of Ten Commandments in courthouse where there is no evidence that this practice was common "at the time the Bill of Rights was proposed and

_____

[25]  See also, e.g., Cammack v. Waihee, 932 F.2d 765, 773 (9th Cir. 1991) (examining whether the conduct at issue is "as deeply embedded in the fabric of the state as was legislative prayer in Marsh."); Jewish War Veterans v. United States, 695 F. Supp. 3, 14 (D.D.C. 1988) (indicating that Marsh applies when the government activity is "deeply embedded in the history and tradition of this country" or interwoven into "the fabric of society.").

adopted").[26]

Unlike these cases, however, it appears from the current historical record before the Court that inaugural prayer can be traced to the founding of this country. Shortly before the first inauguration of George Washington in 1789, a Senate Committee resolved that "after the oath shall have been administered to the President, he, attended by the Vice-President, and members of the Senate, and House of Representatives, [shall] proceed to St. Paul's Chapel, to hear divine service, to be performed by the chaplain of Congress already appointed." Steven B. Epstein, Rethinking the Constitutionality of Ceremonial Deism, 96 Colum. L. Rev. 2083, 2106 (1996) (quoting 1 Joseph Gales, The Debates and Proceedings in the Congress of the United States 25 (1834)). A House Committee passed a nearly identical resolution. Pursuant to these resolutions, immediately after the administration of the oath and the inaugural address, President Washington proceeded to St. Paul's Chapel, where the Chaplain of the Senate read prayers from the Book of Common Prayer. Id.

From President Washington's second inauguration in 1793 to President Franklin Roosevelt's second inauguration in 1937, the inaugural prayer was moved from a church to the Senate chambers of the Capitol Building, where it was given during administration of the oath of the Vice-President. See id. & n. 137. Moreover, at the same time that an inaugural prayer was being given by clergy at a church or at the Capitol, each of the Presidents (including several

_____

[26] See also Cammack, 932 F.2d at 773 ("Hawaii's recognition of Good Friday stems back to its days as a territory; the holiday has been celebrated for longer than Hawaii has even been a state. Nonetheless, it cannot be said that the Good Friday holiday is as deeply embedded in the fabric of the state as was legislative prayer in Marsh.").

Founding Fathers) was also offering "supplications" to an Almighty Being in his inaugural address.  President Washington, for example, stated that "[i]t would be peculiarly improper to omit in this first official act my fervent supplications to that Almighty Being who rules over the universe  . . . that His benediction may consecrate to the liberties and happiness of the people of the United States a Government instituted by themselves for these essential purposes."  See Def. Mot. Dismiss, Ex. J (Inaugural Addresses of the Presidents of the United States) at 2; see also id. at 22-23 (benedition of President Jefferson in 1805); id. at 28 (benedition of President Madison in 1809).

The inaugural prayer was moved outside of the Capitol to the East Portico and incorporated into the inaugural ceremony beginning in 1937.  From that point on, each of the Presidential inaugurations has featured at least two prayers delivered by clergymen invited by the President.  These prayers have frequently been sectarian, with references to "Jesus Christ our Lord" and "the Father, . . . the Son, and . . . the Holy Ghost."  They also have often been delivered, even in a single inauguration, by clergy of several faiths.  On at least one occasion, the President delivered an official prayer himself.[27]  See Compl., App. D (list of inaugural clergy).

This history is distinctive, and is not found in any case that has declined to apply the Marsh exception.  To prove his claim on the merits, Newdow would have to show that a House and Senate resolution at the first inauguration requiring a clergy-led inaugural prayer at a church; a

---

[27]  During President Nixon's second inauguration, five prayers were given, each by a different prayer-giver.  On at least seven occasions, most recently in the second inauguration of President Reagan, a Rabbi was invited to give a prayer.  President Eisenhower gave a formal prayer himself during his first inauguration.  See Compl., App. D.

practice of clergy-led inaugural prayer inside the Capitol from 1793 to 1933; a practice of clergy-led inaugural prayer outside the Capitol from 1937 to 2001; and frequent mentions of God, benedictions, and at least one prayer in the Presidential addresses themselves, taken together, do not establish a tradition of inaugural prayer that is sufficiently "embedded in the history and tradition of this country" to fall within the settings as to which Marsh allows a role for ceremonial deism in our nation's events consistent with Establishment Clause jurisprudence. Marsh, 463 U.S. at 791.

The Court need not at this time conclusively resolve the history of inaugural prayer or the standard for what qualifies as a constitutional tradition under Marsh. It suffices to observe that the history currently in the record pulls this case closer to those where a ceremonial prayer or other religious act has been permitted under Marsh than to those where it has not been, and that this circumstance poses at least some difficulty for Newdow's constitutional claim. In particular, here there is an official endorsement of inaugural prayer by the Framers (in this case, in the form of Senate and House resolutions), a historical detail that was regarded as strong evidence of a constitutional tradition for legislative prayer in Marsh, but is absent in cases where reliance on Marsh has been rejected. Compare Katcoff v. Marsh, 755 F.2d at 232 (applying Marsh to uphold the use of a military chaplaincy because of "Congress' authorization of a military chaplaincy before and contemporaneous with the adoption of the Establishment Clause") with Constancy, 947 F.2d at 1148 ("Unlike legislative prayer, there is no similar long-standing tradition of opening courts with prayer. Nor is there any evidence regarding the intent of the Framers of the Bill of

Rights with regard to the opening of court with prayer.").[28]

The presence of a sufficient constitutional tradition standing alone does not end the

inquiry.  As indicated earlier, Marsh and County of Allegheny both suggest that even a long

tradition of ceremonial prayer might run afoul of the Establishment Clause if there is an

"indication that the prayer opportunity has been exploited to proselytize or advance any one, or to

disparage any other, faith or belief."  Marsh, 463 U.S. at 794; see County of Allegheny, 492 U.S.

at 603 (even the "unique history" of legislative prayer cannot "justify contemporary legislative

prayers that have the effect of affiliating the government with any one specific faith or belief").

Courts have differed in their interpretations of this language.

The Tenth Circuit sitting en banc has taken one view of proselytization, observing that "all

prayers 'advance' a particular faith or belief in one way or another," and that even the prayer in

Marsh -- a "Judeo Christian" benediction delivered by a Presbyterian minister -- "evokes a

particular concept of God" that is not shared by all.  Snyder v. Murray City Corp., 159 F.3d 1227,

1234 n.10 (10th Cir. 1998) (en banc).  That court therefore chose to read the Supreme Court as

prohibiting "a more aggressive form of advancement" in its ceremonial deism cases:  "By using

the term 'prosyletize,' the Court indicated that the real danger in this area is effort by the

government to convert citizens to particular sectarian views."  Id.

The Fourth Circuit recently adopted a different approach, reading Marsh to prohibit any

---

[28]  See County of Allegheny, 492 U.S. at 602 (explaining that Marsh "relied specifically on
the fact that Congress authorized legislative prayer at the same time that it produced the Bill of
Rights"); see generally  Carter v. Broadlawns Med. Center, 857 F.2d 448, 453 (8th Cir. 1988)
(holding that the key to the historical inquiry under Marsh is the "contemporaneous actions of
those who drafted the First Amendment").

"displays of denominational preference," such that "frequent" and exclusive referencs to "Jesus Christ" without any reference at all to other religious deities draws a prayer outside of the Marsh exception.  See Wynne v. Town of Great Falls, 376 F.3d 292, 299 (4th Cir. 2004); see also Bacus v. Palo Verde, No. 99-57020, 2002 WL 31724273 (9th Cir. 2002) (finding advancement within the meaning of Marsh where "the record indicates that the same individual almost always offered the invocation, always 'in the Name of Jesus,' and no individuals of other religions ever gave the invocation").

This Court does not need to choose today between these different conceptions of "prosyletization," because there has not been a persuasive showing on the present record that inaugural prayer has been used to affiliate or prosyletize under any reasonable definition of those words.  The record contains little more information about the inaugural prayers at this point than the contents of the 2001 prayers and snippets from some earlier prayers.  (The content of the 2005 and future prayers is unknown, and the nature and content of most of the earlier prayers is absent from the record.)  Plaintiff seems to base this portion of his challenge to inaugural prayer entirely on the fact that the 2001 prayers, and perhaps some of the earlier prayers, are sectarian and specifically Christian in nature.

This Court concludes that Newdow is not likely to succeed on his claim under Marsh on the basis of the sectarian nature of the inaugural prayers standing alone in light of the evidence available in the limited record presently before this Court.  Unlike in Snyder, where the court searched for evidence of an attempt to convert to a particular sectarian view, or in Wynne or Bacus, where the court found sectarianism but also that different perspectives on a supreme being

were never given a voice, the record here is quite different.  The record before the Court indicates

that in most inaugurations, at least two different clergypeople have delivered prayers.  At many

inaugurations, one of the prayer-givers was a Rabbi.[29]  Even when the Jewish faith was not

represented, the prayer-givers appear frequently to have represented different denominations.  See

generally Compl., App. D.  These facts again distinguish this case from those where

proselytization was found, and are inconsistent with the notion that the government is "exploiting"

the prayer opportunity to "proselytize" a particular faith or creed within the meaning of Marsh. [30]

It is noteworthy that Marsh upheld a legislative chaplaincy program where a single

chaplain representing one religious denomination (Presbyterian) had served for sixteen years.  See

---

[29]  Even when a Rabbi is present, the prayers still exclude those who do not believe in
monotheism (for example, those who practice the Hindu faith).  See Chaudhuri v. Tennessee, 130
F.3d 232, 237 (6th Cir. 1997).  This recurring issue in Establishment Clause jurisprudence is
mentioned here only to highlight that if the Marsh test were allowed to turn entirely on the
sectarian nature of a single prayer (in the sense of referring to a conception of a supreme being
that others do not share), notwithstanding any extrinsic evidence relating to whether the prayer
were being used to advance or proselytize a particular faith, it is difficult to imagine a prayer that
would survive the Marsh test (including the "Judeo-Christian" prayer in Marsh).

[30]  On the other hand, even the dissenting opinion in Lee v. Weisman, authored by Justice
Scalia, noted that:

> I will further concede that our constitutional tradition, from the Declaration of
> Independence and the first inaugural address of Washington, quoted earlier, down
> to the present day, has, with a few aberrations, ruled out of order
> government-sponsored endorsement of religion--even when no legal coercion is
> present, and indeed even when no ersatz, "peer-pressure" psycho-coercion is
> present--where the endorsement is sectarian, in the sense of specifying details upon
> which men and women who believe in a benevolent, omnipotent Creator and Ruler
> of the world are known to differ (for example, the divinity of Christ).

Lee, 505 U.S. at 641 (Scalia, J., dissenting).  It is unclear, however, whether this "concession" was
solely for purposes of argument.

Marsh, 463 U.S. at 793.  Marsh explained that "[a]bsent proof that the chaplain's reappointment

stemmed from an impermissible motive, we conclude that his long tenure does not in itself

conflict with the Establishment Clause."  Id.  Newdow has not come forward with evidence of an

impermissible motive in the selection of the clergy here, and much of the evidence in the present

record suggests a diversity of denominations that is at least somewhat inconsistent with an attempt

to proselytize.

　　Establishment Clause jurisprudence, including cases interpreting Marsh, remains complex

and unresolved.  Under that law, however, Newdow faces considerable obstacles in attempting to

show that prayer at the inauguration falls outside of Marsh.[31]  These obstacles may not be

insurmountable.  Nevertheless, they are substantial enough that the Court concludes that Newdow

has not offered a sufficient record to establish at this time a substantial likelihood of success in

drawing this case apart from legislative prayer, military chaplains, and other similar acts of

ceremonial deism that come within the Marsh exception to general Establishment Clause

jurisprudence.[32]  Newdow certainly has not done so to the extent necessary for the sweeping relief

---

　　　[31]  Other factors considered by courts applying Marsh do not plainly favor Newdow.  The
consideration that a prayer at an inauguration is directed to a public audience rather than in the
legislature (where it is directed at the legislators), lends support to his position.  See Constangy,
947 F.2d at 1149.  On the other hand, unlike in many of the cases and even in Marsh, the
inaugural prayer in this case is not subsidized financially by the government.  See Van Zandt v.
Thompson, 839 F.2d 1215, 1217 (7th Cir. 1988).

　　　[32]  Were Newdow able to establish that this prayer does not fall under the Marsh exception
for ceremonial prayer, the Court would then turn to analyzing the claim under the principles of
Lemon v. Kurtzman.  See American Civil Liberties Union of Ohio Foundation, Inc. v. Ashbrook,
375 F.3d 484, 494 (6th Cir. 2004); North Carolina Civil Liberties Union Legal Found. v.
Constangy, 947 F.2d 1145, 1149 (4th Cir. 1991).  Newdow's claim probably raises a serious
constitutional question under both the "purpose" and "effect" prongs of the Lemon approach.  See,
e.g., Coles v. Cleveland Board of Educ., 171 F.3d 369, 383 (6th Cir. 1999) ("Moreover, the

he seeks here.

Newdow's remaining claims carry little force.  He argues that inaugural prayer burdens his rights under the Free Exercise Clause and RFRA.  The law is clear, however, that governmental programs that "may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs" do not infringe on free exercise rights protected by the First Amendment (and therefore RFRA).  Lyng v. Northwest Indian Cemetary Protective Ass'n, 485 U.S. 439, 450-51 (1988); see also Henderson v. Kennedy, 253 F.3d 12, 16 (D.C. Cir. 2001) (no free exercise violation where plaintiffs cannot show that the government conduct "forces them to engage in conduct that their religion forbids or that it prevents them from engaging in conduct that their religion requires").  Newdow does not cite a single authority that has even indicated that government-sponsored prayer might not only establish a favored religion (under the Establishment Clause) but also infringe the free exercise rights of adherents to a disfavored religion (under the Free Exercise Clause or RFRA).  The Court is

---

content of the prayers delivered at the school board meetings clearly went beyond what was necessary to solemnize or bring a more businesslike decorum to such meetings."); Doe v. Duncanville Ind. Sch. Dist., 70 F.3d 402, 406 (5th Cir. 1995) (distinguishing "quintessentially Christian" basketball team prayers from nonsectarian prayers in other cases for purposes of Lemon analysis); Constangy, 947 F.2d at 1150 ("[A]n act so intrinsically religious as prayer cannot meet, or at least would have difficulty meeting, the secular purpose prong of the Lemon test.").

The few cases cited by defendants that have reached a contrary result are notable insofar as they involved non-denominational prayer and emphasized that fact in their Lemon analysis.  See, e.g., Chaudhuri, 130 F.3d at 237 ("TSU's former practice of including nonsectarian prayers at its events met the 'secular purpose' element of the Lemon test."); Tanford v. Brand, 104 F.3d 982, 986 (7th Cir. 1997) (holding that the "financial aid to church-related educational institutions" in Lemon is "a far cry from the non-denominational invocation and benediction at the Bloomington commencement").

unaware of any such authority.  Newdow simply has not shown that he enjoys a substantial

likelihood of success on his Free Exercise or RFRA claims.[33]

In sum, Newdow faces numerous and considerable obstacles to prevailing on his claims.

There is a strong argument that his claims are barred by issue preclusion, there is some doubt as to

his injury-in-fact and considerable doubt as to redressability, and significant problems confront his

claims on the merits as they currently rest.  Taken together, the Court must conclude on the

---

[33]  Dancing in the shadows of this case are a range of other issues that did not receive full briefing, but nonetheless counsel additional caution at this stage.

There is, for instance, the question whether selection by a President (or, to place the issue in starker relief, the President-Elect) of an unpaid clergyperson to pray at his inaugural ceremony is state or governmental action.  Even the defendants cannot agree on the answer to this question: The federal defendants acknowledged at the hearing that there was state action, while the Presidential Inaugural Committee disagreed.  As for the question whether PIC itself is a state actor, the Court agrees with the PIC that Newdow has not raised a substantial question as to that issue on the present record, which indicates only that the PIC -- otherwise a privately incorporated and funded organization -- is selected by the President.  See West v. Atkins, 487 U.S. 42, 52 & n.10 (1988).

Related to this issue is the distinctive nature of prayer at the direction of the President instead of the Congress.  No one seems to doubt, and Newdow does not challenge in this litigation, that a President has the legal right to pray himself at his inauguration.  This case therefore poses the issue of the President's free speech rights (if any in this context), and when personal religious choices assume the aura of state endorsement such that they must bend to the Establishment Clause.  See Constangy, 947 F.2d at 1151 (noting that a judge wearing a robe and praying from the bench is state action, and that he is "free to recite a personal prayer in the privacy of his home or chambers before he goes on the bench").

Finally, there is the not insignificant problem that plaintiff is seeking a prior restraint of prayer in his motion for a preliminary injunction.  Courts are particularly hesitant in issuing that relief, which potentially implicates First Amendment problems itself.  See Org. For A Better Austin v. Keefe, 402 U.S. 415 (1971).  That uncertainty is compounded, of course, when the prior restraint is of the President's freedom to choose to have certain speech at his Inauguration.

present record that Newdow has not shown a substantial likelihood of success on his

constitutional and statutory challenge to clergy-led inaugural prayer.

## III.   Balance of Harms

On the basis of that same record, Newdow likewise has not demonstrated that the balance

of harms here strongly favors the injunctive relief he seeks.  Certainly his showing is not sufficient

to overcome the marginal showing of a likelihood of success on the merits of his claims.  The

threat of harm to his rights absent the requested injunction is generalized rather than specific,

there is at least some risk of harm to others from entry of an injunction, and in the present

circumstances the public interest simply does not favor the extraordinary relief that Newdow

seeks.

### A.      Threat of Harm to Newdow Absent an Injunction

The lynchpin of a request for preliminary injunctive relief is a showing of irrreparable

injury to the movant in the absence of the requested relief.  See Sociedad Anonima, 193 F. Supp.

2d at 13-14.  The harm must be concrete and immediate to warrant extraordinary injunctive relief,

and vague or speculative injury will not suffice.  See Wisconsin Gas Co. v. Fed. Regulatory

Comm'n, 758 F.2d 669, 674 (D.C. Cir. 1985) ("the injury must be both certain and great; it must

be actual and not theoretical").  In short, the threatened injury must be of such imminence that

there is a clear and present need for equitable relief to prevent irreparable harm, because

injunctions are not intended "to prevent injuries neither extant nor presently threatened, but only

merely 'feared.'"  Comm. in Solidarity v. Sessions, 929 F.2d 742, 745-46 (D.C. Cir. 1991)

(citations omitted).

Newdow alleges an injury to his fundamental constitutional rights, which generally is considered irreparable harm warranting injunctive relief.  However, the impact of any prayer at the 2005 Inauguration on his constitutional rights is not direct -- he is not required or forbidden to do anything.  He need not attend the Inauguration in person or through television, radio or the internet.  Of course, having to choose not to attend or view the Inauguration, which Newdow now contends is what befalls him, may itself be a cognizable harm.  Forcing one to make such a choice between attendance, with a resulting effect on First Amendment rights, and foregoing participation is often sufficient to create constitutional injury.  See Lee, 505 U.S. at 593 ("the State may not, consistent with the Establishment Clause, place primary and secondary school children in this position").  Still, as explained above with respect to his injury-in-fact, Newdow's alleged injury remains somewhat tenuous, not concrete.  He simply wishes not to have to confront any religious expression during the Inauguration.  But he has the means at hand to avoid that abstract injury.

Defendants have directed the Court to certain other factors with respect to Newdow's claimed injury and request for extraordinary injunctive relief.  This action was not filed until December 21, 2004, just a month before the scheduled date of the 2005 Inauguration.  The record reflects that Newdow had his ticket to attend by mid-November, more than a month earlier.  This delay in seeking a preliminary injunction has placed defendants and the federal courts in a difficult position.  An unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm.  See Oakland Tribune, Inc. v. Chronicle Pub. Co., 762 F.2d 1374, 1377 (9th Cir. 1985); GTE Corp. v. Williams, 731 F.2d 676,

678-79 (10th Cir. 1984); Nat'l Council of Arab Americans v. City of New York, 331 F. Supp. 2d

258, 265-66 (S.D.N.Y. 2004).  Moreover, defendants assert that Newdow seeks a mandatory

preliminary injunction that would alter the status quo by precluding the planned clergy prayers at

the Inauguration, and that the preliminary relief he seeks would constitute the ultimate relief in the

case with respect to the 2005 Inauguration.  Both these considerations dictate caution by this

Court.  See Nat'l Conference on Ministry to Armed Forces v. James, 278 F. Supp. 2d 37, 43

(D.D.C. 2003) (mandatory preliminary injunction should not issue unless the facts and law clearly

favor the movant); Univ. of Texas v. Camenisch, 451 U.S. 390, 395 (1981) ("[I]t is generally

inappropriate for a federal court at the preliminary injunction stage to give a final judgment on the

merits.").[34]

###    B.    Harm to Others and the Public Interest If An Injunction Is Entered

Weighed against this less than compelling showing of irreparable harm to Newdow are

important concerns of injury to others and the public interest.  An injunction would restrict the

Free Exercise interests of the non-governmental clergy members invited to give an invocation or

benediction at the Inauguration.  Even more fundamentally, an injunction would impact the

speech and other interests of the President in including prayer as part of a ceremonial event

renewing his efforts in leading this nation.  After all, each inaugural ceremony is quite personal to

the President honored, even down to the choice of clergy participating.  Indeed, the thought of a

federal court directly restraining the President from conducting his inauguration ceremony as he

---

[34]  The Court questions, however, whether the injunction sought here is "mandatory" or
"affirmative" in the sense defendants contend.  The requested relief would simply prohibit clergy-
led prayer at the 2005 Inauguration.

sees fit must necessarily give one pause.

Most importantly to the balance of interests here, there must be an appropriate assessment of the public interest.  Preliminary injunctive relief may be withheld if contrary to the public interest, even if other factors support such relief, and consideration of the public interest is particularly crucial in a suit seeking to enjoin governmental action being carried out pursuant to a statute intended to serve the public interest.  See Weinberger v. Romeo-Barcelo, 456 U.S. 305, 312-13 (1982); Yakus v. United States, 321 U.S. 414, 440-41 (1944).

There is a strong argument that, at this late date, the public interest would best be served by allowing the 2005 Inauguration ceremony to proceed on January 20 as planned.  That would be consistent with the inclusion of clergy prayer in all Presidential inaugurations since 1937, and with the inclusion of religious prayer or reference in every inauguration commencing with the first inauguration of President Washington in 1789.  To do otherwise, moreover, would at this eleventh hour cause considerable disruption in a significant, carefully-planned, national event, requiring program and other adjustments.  The material change requested by Newdow in an accepted and well-established historical pattern of short prayers or religious references during Presidential inaugurations, based on this last-minute challenge, is not likely to serve the public interest, particularly where Newdow's ability to proceed with this action remains in doubt and  there is no clear evidence of impermissible sectarian proselytizing.

## CONCLUSION

For all of these reasons, the Court denies Newdow's motion for a preliminary injunction that would enjoin the President and others from permitting clergy-led prayer at the 2005

Inauguration.  Given the significant doubt that his action can proceed in the face of substantial questions relating to issue preclusion and standing, and the absence of a clearly established violation of the Establishment Clause, the Court concludes that Newdow has not satisfied the threshold requirement for extraordinary preliminary relief -- a convincing showing of a substantial likelihood of success on the merits.  Moreover, the balance of harms here, and particularly the public interest, does not weigh strongly in favor of the injunctive relief Newdow requests, which would require the unprecedented step of an injunction against the President.

Newdow has thus not met his burden of establishing that the extraordinary remedy of preliminary injunctive relief is warranted under the present circumstances.  The motion for a preliminary injunction is therefore denied.  The Court will require supplemental submissions from plaintiff and defendants with respect to the issue preclusion and standing questions relevant to defendants' motions to dismiss.  A separate order will be issued.[35]

_____/s/ John D. Bates_____
JOHN D. BATES
United States District Judge

Dated:   __January 14, 2005_____

---

[35]  At the January 13 hearing, the Court informed the parties that it would at this time resolve any anticipated request for an injunction or stay pending appeal.  The Court concludes that Newdow would not be entitled to an injunction pending appeal, the test for which is much the same as for a preliminary injunction.  The balance of harms, and especially the public interest, does not support such relief, particularly since it must run against the President, and Newdow has not made a convincing case at this time either that his action can proceed or that he is likely to prevail on the merits of his First Amendment claims.

Copies to:

Michael Newdow
Post Office Box 233345
Sacramento, California  95823
916-427-6669  (telephone)

Nicholas J. Patterson
U.S. Department of Justice
20 Massachusetts Avenue, Northwest
Room 7109
Washington, D.C.  20001
202-514-4523  (telephone)
202-616-8470  (fax)
E-mail:  nicholas.patterson@usdoj.gov

George J. Terwilliger
White & Case, L.L.P.
701 13th Street, Northwest
Washington, D.C.  20005
202-626-3600  (telephone)
E-mail:  gterwilliger@whitecase.com

James Matthew Henderson, Sr.
American Center for Law and Justice
201 Maryland Avenue, Northeast
Washington, D.C.  20002
202-546-8890  (telephone)
202-337-3167  (fax)
E-mail:  JMHenderson@aclj-dc.dc.org